EDUCATIONAL CREDIT MANAGE-
MENT CORPORATION, et al.,
Plaintiff,

v.

David A. BARNES and Nancy
K. Barnes, Defendants.

No. NA4:00–241–C–B/S.

United States District Court,
S.D. Indiana,
New Albany Division.

Dec. 15, 2004.

Kevin Dempsey, U.S. Trustee, Indianapolis, IN.

John S. Egan, Frost Brown Todd, Louisville, KY.

Jeffrey L. Hunter, United States Attorney's Office, Indianapolis, IN.

David C. Ollis, New Albany, IN.

Lloyd Koehler, Pettay & Associates, New Albany, IN.

## *ORDER*

BARKER, District Judge.

This Chapter 13 bankruptcy case is before the court pursuant to the February 26, 2001 order entered by the Honorable S. Hugh Dillin withdrawing the order of reference to the United States Bankruptcy Court for the Southern District of Indiana.[1] Plaintiff, Educational Credit Management Corporation ("ECMC"), sought the withdrawal of reference in light of the Chapter 13 Trustee's ("Trustee") objection to its proof of claim, filed in connection with the bankruptcy of defendants, David and Nancy Barnes, which included a constitutional challenge to 34 C.F.R. § 682.410(b)(2). That section requires the court to interpret, as opposed to simply apply, federal law beyond the provisions of Chapter 11 of the Bankruptcy Code. The issue we are asked to resolve here relates to the constitutionality of a federal regulation imposing collection charges as a part of the amount claimed on defaulted student loans which have been guaranteed by the government.

## BACKGROUND

The debtors (defendants in this action) are David A Barnes and Nancy K. Barnes, who filed for Chapter 13 bankruptcy protection on November 15, 1999. At the time of filing, David Barnes had two unpaid federally guaranteed student loans which had been backed by Great Lakes Higher Education Association.

Federally subsidized student loans, issued pursuant to the Federal Family Education Loan program and other similar programs, are made by local private financial institutions under terms approved by the U.S. Department of Education (the "Department"). Repayment of the loans is guaranteed by various state government and non-profit guaranty agencies. If a student loan goes into default, the lender is required to pursue payment from the student borrower for the first nine months following default, after which the lender can bring a claim against the guarantor. 20 U.S.C. § 1085(1). After the guarantor pays off the debt to the local lender, the guarantor has 45 days within which to offer to the student borrower, in writing, a chance to challenge the amount claimed to be due or to cure the default through immediate voluntary repayment or repayment in accord with newly negotiated terms based upon the borrower's current ability to pay. 34 C.F.R. §§ 682.410(b)(5), (6). If the borrower does not take advantage of this opportunity, the guarantor is required to include in the debt amount an additional charge to cover collection costs, in accordance with 34 C.F.R. § 682.410(b)(2). The guarantor is required to pursue collection of the defaulted loan, but may, upon application from the Department, receive a reinsurance payment from the Department of up to 95% of the amount of the loan. 20 U.S.C. § 1078(c)(1)(A). If finally the guarantor is

---

1. Subsequent to the February 26, 2001 order, Judge Dillin retired and the case was assigned to the docket of the undersigned judge.

unsuccessful in recovering the amount owed from the borrower, the loan is assigned for collection to the Department, which undertakes the collection efforts directly with the borrower.

In this case, Mr. Barnes's loans had been in default prior to the bankruptcy filing and Great Lakes had paid the lender pursuant to its guaranty and received reimbursement from the Department. Because all the efforts to recover from the borrower had been unsuccessful, the loans were assigned to the Department. Approximately four months after the filing of the bankruptcy, the Secretary of Education assigned the loans to plaintiff, ECMC, a Commonwealth of Virginia guarantor which receives nationwide assignments from the Department of loans whose borrowers have filed for bankruptcy protection. On March 8, 2000, ECMC filed a timely claim in the Barneses' bankruptcy proceedings for $9,108.01, which amount included principal, interest and collection costs owed on the outstanding loans. It is the imposition of the collection costs which gives rise to this dispute, which turns out to be a large and fairly difficult legal question (given the Constitutional implications) about an admittedly small fee.

The portion of the total claim allocated to collection costs is $1,394.08, which represents 18.06% of the principal and interest owed. This amount was calculated as a flat rate, pursuant to the terms of 34 C.F.R. § 682.410(b)(2)(I)[2], a regulation promulgated by the Department. While there is an issue as to whether the regulation prohibits applying the formula under the circumstances here, there is no controversy with respect to the accuracy of the calculation and no question that the specific amount satisfies the requirements of the regulation that it be the lesser of two possible amounts calculated under 34 C.F.R. § 682.410(b)(2).

The Trustee objects to the collection costs claimed by ECMC, alleging that no actual collection efforts, other than the filing of the claim, have been pursued by ECMC, making the claim unreasonable. In addition, the Trustee argues that the use of a system-wide cost-spreading formula,[3] rather than a calculation of actual costs incurred with each claim, renders the regulation arbitrary and capricious and manifestly contrary to the enabling statute, 20 U.S.C. § 1091. ECMC rejoins in

---

**2.** 34 C.F.R. § 682.410 **Fiscal, administrative and enforcement requirements**

　　*　　*　　*　　*　　*　　*

(b) *Administrative requirements—*

　　*　　*　　*　　*　　*　　*

(2) *Collection charges.* Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim. These costs may include, but are not limited to, all attorney's fees, collection agency charges, and court costs. Except as provided in §§ 682.401(b)(27) and 682.405(b)(1)(iv), the amount charged a borrower must equal the lesser of—

(I) The amount the same borrower would be charged for the cost of collection under the formula in 34 CFR 30.60; or

(ii) The amount the same borrower would be charged for the cost of collection if the loan was held by the U.S. Department of Education.

**3.** The formula prescribed for assessing collection costs in lieu of using the flat 25% rate that would have been applied at the time had the U.S. Department held the loans is detailed in 34 C.F.R. § 30.60 and, when applied by ECMC, results in a flat rate of 18.06%. The formula was adopted by the Department as a "make whole" approach applied to collect the costs incurred by guarantors across the entire portfolio of defaulted loans, as opposed to attempting to calculate the actual collection costs incurred with respect to each loan.

defense of its claim by noting that the collection of costs calculated pursuant to the regulation is mandated by statute, 20 U.S.C. § 1091a(b) [4] and may not be altered by the bankruptcy court (or, presumably, by this court). Subsequent to the withdrawal of reference to the bankruptcy court, the Secretary of Education was added as an intervening party and now joins with ECMC in its defense both of the regulation and its application to defaulted loans held by debtors in bankruptcy.

The Trustee's final contention is that 11 U.S.C. § 502 allows the court to make the ultimate determination of whether or not the collection costs in a particular case are reasonable, when a claim is challenged through an objection. ECMC disagrees, contending that § 502 requires the court to determine the amount of the claim and then to impose it, unless certain exceptions are found, none of which apply here.

## STANDARD OF REVIEW

Though each side puts its own spin on the Supreme Court decision in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), there is no dispute that that opinion guides our review of the constitutionality of this administrative regulation:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

> "The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious or manifestly contrary to statute.

*Id.* at 842–844, 104 S.Ct. 2778.

 When Congress uses broad language in issuing a statutory or regulatory mandate, the party challenging the regulation bears a significant burden. Consider-

---

**4.** 20 U.S.C. § 1091a(b) provides in pertinent part:

§ **1091a Statute of limitations, and State court judgments**

(b) Assessment of costs and other charges
Notwithstanding any provision of State law to the contrary—

(1) a borrower who has defaulted on a loan made under this subchapter ... shall be required to pay, in addition to other charges specified in this subchapter ..., reasonable collection costs; ....

able deference is to be given the regulation, requiring the challenging party to "make a compelling argument" that Congress could only have intended that the language of its legislation be interpreted in the manner he is promoting. *Kikalos v. C.I.R.*, 190 F.3d 791, 798 (7th Cir.1999).

In this instance, the key term, is "reasonable." The statutory mandate set out in 20 U.S.C. § 109la requires that a defaulting debtor pay an amount equal to "reasonable collection charges." Applying the holding in *Chevron*, since Congress did not define "reasonable collection charges," we must determine whether the agency's regulatory elucidation of "reasonable collection charges" is, itself, "reasonable," a determination made initially on a broader and more general basis and then on the basis of its application to the circumstances in this case.

The Trustee urges, however, that before we decide the constitutionality of 34 C.F.R. § 682.410(b)(2), we must determine whether that provision conflicts with the Bankruptcy Code. The Trustee maintains that 11 U.S.C. § 502(b)(1) vests in the bankruptcy court the power to determine whether the collection costs ECMC seeks in this case are reasonable and should be awarded. While we are in full agreement that the issue of any potential conflict needs to be addressed, we conclude that a decision first must be made as to the constitutionality of the regulation, either facially or as applied by the agency, since if it is found to be unconstitutional, the regulation must be stricken, leaving no issue

respecting its conflict with bankruptcy laws to be resolved.

## ANALYSIS

### I. *Is 34 C.F.R. § 682.410(b)(2) Constitutional?*

**A. Is the regulation arbitrary and capricious on its face in its methodology for assessing a charge to cover costs of collection of debt?**

█ Title 31, U.S.C. § 3717(e) requires the agency undertaking to collect a federal claim [5] to assess a charge to cover the costs incurred in processing the delinquent claim. The Secretary and ECMC both cite the Federal Claims Collection Standards ("FCCS") (promulgated to implement the Debt Collection Act of 1982) permitting "make whole" assessments based on average costs, as opposed to the necessity of tracking and assessing actual costs on each individually defaulted loan, as authority for assessing reasonable collection costs in the current matter. The precise authority for this approach under the FCCS, prior to relatively recent amendments [6] provided that:

> An agency shall assess against a debtor charges to cover administrative costs incurred as a result of a delinquent debt— that is, the additional costs incurred in processing and handling the debt because it became delinquent as defined in § 101.2(b) of this chapter. Calculation of administrative costs should be based upon actual costs incurred or upon cost analyses establishing an average of actual additional costs incurred by the agency in processing and handling claims

---

**5.** The parties appear to agree that attempts to collect on delinquent federally-backed student loans qualify as "federal claims," whether the claims are asserted by the Department or a guarantor such as ECMC.

**6.** The FCCS provisions relating to the assessment of administrative costs on delinquent debts has been re-codified at 31 C.F.R. § 901.9(c) and now specifically allows for an assessing agency to estimate administrative costs.

against other debtors in similar stages of delinquency.

4 C.F.R. § 102.13(d)(1999).

In his initial brief, the Trustee contended that the flat-rate percentage approach provided for in 34 C.F.R. § 682.410(b)(2) reflects a choice of convenience made by the Secretary when formulating the department's regulations and that there is no good reason to employ the formula in situations, such as the case at bar, where the only costs incurred in collecting the loan were generated in preparing and filing a proof of claim. According to the Trustee, adding a set fee to the amount of the debt is inimical to the "fresh start" philosophy implicit in bankruptcy law and requires the bankrupt's other creditors to shoulder unfairly the burden of ECMC's claim for reimbursement of costs which far exceed what it actually incurred in this particular delinquent loan claim.[7]

Whether 34 C.F.R. § 682.410(b)(2) (the text of which is set out in Fn. 2) is facially flawed appears to turn on whether cost averaging from which a flat rate percentage is applied is permissible as a "reasonable method" of assessing collection costs. Cost averaging as a means of allocating and recouping the collection costs incurred

by the agency inevitably creates individual "winners and losers", which is to say, some borrowers will be assessed amounts that are higher than the actual amounts of their individual costs, and some, lower amounts.

We view cost averaging as a tool of efficiency, utilized to capture costs which cannot easily be identified and assigned and tracked individually based on a specific instance. In reviewing the reasonableness of cost averaging in assessing collection costs associated with delinquent loans, care obviously must be given to assure that any disparity between the actual costs of collection and the imposed costs is kept to a minimum so that the benefits of efficiency are not trumped by unfair hardship to some borrowers. We have no basis for concluding that the agency did not achieve such a proper balance in this instance. Since the burden of overcoming the deference to which the regulatory agency is entitled is on the Trustee and since he has failed to sustain that burden here, we must overrule his objection as we explain in greater detail below.[8]

The Secretary and ECMC have traced the adoption of cost averaging procedures by agencies within the government (includ-

7. Throughout the briefing, the Trustee persists in describing the costs of collecting Barnes's delinquent loans as being only what it cost ECMC to file a proof of claim. To us, that seems a specious characterization of what actually is entailed in and by that term. Though the costs were not directly incurred by ECMC, there certainly were collection costs incurred by the original guarantor, Great Lakes Higher Education Association, in attempting to collect the loans which had been in default for more than a decade prior to the Barneses filing for bankruptcy protection. Theoretically, since those specific costs are lumped into the aggregate calculation of Great Lakes's flat rate costs, we suppose some debtor somewhere might object to Great Lakes's flat rate formula to assess the collection costs in their particular case, but averaging costs and imposing assessments in a make-whole manner does not make that approach to collection manifestly contrary to the law. In addition, there is obviously more to collection in a Chapter 13 bankruptcy than the filing of a single proof of claims: someone must monitor the proceedings, review the work-out plan and keep track of compliance with the plan.

8. The Secretary and ECMC have established, indeed, the Trustee has not challenged, that the regulation at issue was appropriately published in its proposed form and that comments received from interested parties were properly taken into account before it was officially adopted. So, no procedural flaws have been found in the promulgation of this regulation.

ing the Attorney General, the Comptroller General and the OMB, as well as the Department) to efforts aimed at implementing the intent of Congress that the borrowers, not taxpayers, foot the bill for the costs associated with the collection of delinquent school loan debts. The Trustee rejoins, contending that there is a significant difference between the actual costs of collection and the amount determined to be the average flat rate. Beyond this argument, however, he has provided no evidence of such disparity between collection costs incurred in chasing down and collecting on debts from delinquent borrowers and cost averaging as an unreasonable means of assessing reasonable costs against them. Absent some convincing proof, we have no basis for holding the regulation facially unconstitutional.

Furthermore, the fresh-start principle which is the root of all bankruptcy law, is not undermined by the cost-averaging approach. In any event, student loans have long been an exception to the fresh-start principle as seen in the directive of Title 11 U.S.C. § 523(a)(8) making student loans presumptively non-dischargeable, unless it can be shown that excepting them from discharge imposes an undue hardship on the borrower/debtor. Collection costs are generally assessed on all delinquent loans, not just those in bankruptcy; thus they are not fairly to be viewed as a non-dischargeable penalty apart from the debt itself. *See In re Featherston*, 238 B.R. 377 (Bankr.S.D.Ohio 1999). In our view, the regulation requiring all borrowers to pay collection costs associated with their loans is consistent with the theory that underlies a non-dischargeable education loan.

Nor do we regard average flat-rate regulation to be arbitrary or capricious, imposing an unfair burden on Chapter 13 debtors' unsecured creditors to underwrite collection costs. The obligation to pay collection costs attached before the Barneses filed for bankruptcy. Had they been able to pay this debt without the necessity of bankruptcy, the pay-off terms would likely have included the assessment and payment of collection costs if the loans were delinquent. Therefore, at the time the bankruptcy petition was filed, the Barnes owed collection costs and that debt, like any other unsecured credit obligation, would have had the effect of reducing the amount available to pay off other unsecured creditors. In short, we find no basis for concluding that the method of imposing collection costs as provided for in this regulation is arbitrary and capricious.

**B. Is the regulation unconstitutional as administered by the Department?**

█ The Trustee, while not quarreling with treating the guaranteed student loans as federal claims or disputing that pursuant to the FCCS the calculation and assessment of administrative costs based upon an average under some circumstances is permitted, nonetheless contends that 4 C.F.R. § 102.13(d)(1999) defines those circumstances in a manner which would not include the factual scenario here. Specifically, the Trustee cites a provision that modifies the method of calculating an average by requiring that it be for "costs incurred by the agency in processing and handling claims against other debtors *in similar stages of delinquency.*" (emphasis added). Because the loans at issue here were to borrowers who have filed for Chapter 13 bankruptcy and because ECMC applies an average collection costs calculation figured without the inclusion of the actual costs of collecting delinquent loans from borrowers who have filed for bankruptcy, the Trustee maintains that the intent of the FCCS has not been complied with.

The Secretary requires ECMC, like other guarantors, to calculate annually its

costs of collecting delinquent loans. However, the Secretary does not require any guarantor, including ECMC, to include as a cost the cost of collecting delinquent loans in bankruptcy. Collection of loans in bankruptcy is work performed by a separate division of ECMC. Consequently, the costs ECMC plugs into the formula to come up with the fixed percentage rate it charges for collection costs on any delinquent loan do not include costs of collecting loans from a borrower in bankruptcy. This, contends the Trustee, makes the regulation unconstitutional as applied or administered by the Secretary and ECMC in the context of a bankruptcy.

Deposition testimony, to an extent, confirms that, for at least Fiscal Year October 1998 through September 1999, the collection costs incurred by ECMC in pursuing delinquent loans in bankruptcy were, as a percentage of principal and interest, significantly greater than the costs incurred in collecting other delinquent loans. The Trustee does not challenge this finding or the on-the-spot calculations made in deposition by ECMC's Vice–President for Finance. However, the Trustee maintains that, in similar fashion to the loan in this case, the costs of collecting loans in Chapter 13 bankruptcies (which, like personal reorganizations, are aimed at extending or manipulating the terms of debt to more manageable levels so to enable the debt eventually to be paid off) would be substantially less than the costs associated with exempting loans from discharge on the grounds of hardship in a Chapter 7 bankruptcy.

In short, the Trustee's analysis seeks to probe more deeply into the cost structure in an effort to establish inequities. We remain unconvinced that such an approach is necessary, or even preferable, and in any event, we view the matter as a decision well within the Secretary's discretion

in interpreting and applying the statutory requirements. As previously noted, in accepting averaging as a way of calculating a make-whole cost assessment, some variation in the impact of that approach on individual borrowers is to be expected. Theoretically, the Trustee's desire to "drill down" to substrata of data could be limitless: an analysis might be structured whereby blonde, blue-eyed and left-handed borrowers in Chapter 13 bankruptcy would comprise the class on whom would be imposed a larger percentage of the costs. Of course applying averaging principles to such a sub-class could also generate the inequitable result which the Trustee objects to. The question the Court must resolve is far more straight-forward: is the regulation drawn and administered in a manner that permits the deference accorded to the agency via *Chevron* or must the deference be set aside in order to avoid an unreasonable and unjust effect.

According to the Trustee, the Secretary anchors its cost-averaging approach to the Federal Claims Collection Standard (previously codified at 4 C.F.R. § 102.13(d) (1999)), which provides that cost averaging should include the costs incurred by "other debtors in similar stages of delinquency." According to the Trustee, the stage of delinquency in which a Chapter 13 borrower finds himself is not the same as other debtors. Thus, the failure of the Secretary to require ECMC to keep separate track of costs associated with collecting a delinquent loan from Chapter 13 borrowers conflicts with the requirements of the FCCS.

ECMC and the Secretary respond that there is no precedent for singling out bankruptcy debts as a separate category of delinquency. The cost averaging performed by guaranty agencies applies to all loans that have reached the stage of delinquency, thus allowing collection costs to be

assessed.[9] The Secretary contends there is no basis for separating out bankruptcies as a specific "level of delinquency."

We agree with the Secretary's analysis. The Trustee offers no convincing basis for requiring the agency to make bankruptcy debts a subset of all other debts in terms of assessing costs. We perceive no compelling reason for ECMC to include, or the Secretary to require, in averaging the costs, separate treatment of bankruptcy collections costs from non-bankruptcy collections. In fact, based on the evidence of record, if those costs were included, we would expect the flat percentage rate amount to increase, not decrease. In support of requiring a separate calculation for Chapter 13 loan collections, the Trustee has offered nothing more than a comparison of the collection costs, claiming that for Barnes's loan the costs assessed were $1,394.08 which is simply too much, in the Trustee's judgment, for the comparably minimal effort of filing a proof of loss and reviewing the plan of repayment submitted. We will not overturn the Secretary's approach on so subjective and unconvincing an argument, and we find nothing in that approach to render it unconstitutional.

**C. Is a lack of competitive bidding for assigned loans held by bankrupt borrowers sufficient to render the "make whole" formula unreasonable and thus unconstitutional as applied in these circumstances?**

In his briefing, the Trustee has made much of the fact that ECMC receives from the Department virtually exclusive assignment of the loans held by bankrupt borrowers, without any requirement of engaging in competitive bidding. To the Trustee, this lack of competitive bidding negates any prospect that the "make whole" formula could be deemed reasonable.

We find this reasoning to be entirely mis-cast for several reasons. First, competitive bidding is not required by the Higher Education Act of 1965. Pursuant to 20 U.S.C. § 1078–1, the Department is allowed to enter into the type of voluntary flexible agreement that is in place between it and ECMC with regard to such loan assignments (the terms of which other guarantors could accept and agree to as well). Second, the Trustee's argument suggests that the Secretary is obligated to put out for bid the business of collecting these loans, as though the loans were the property of the Department and the agency collecting them was providing a service in return for a fee. In truth, through assignment, the loans become the property of ECMC who then undertakes to collect the amounts due on its own behalf. The Department's interest after an assignment has occurred is limited to its statutory right to receive a percentage of any recoveries (including the amounts added for collection costs) made by the guarantor. 20 U.S.C. § 1078(c). (That rate is currently set at 72% of the gross amounts recovered by the guarantor, which reflects a deduction by the guarantor of its 5% reinsurance percentage and 23% to be applied to the guarantor agency's operating fund. 20 U.S.C. § 1078(c)(6)).

9. A typical delinquency, for example, might have resulted in the guarantors' payment of a defaulted claim to the lender, followed by a letter to the borrower to advise him, among other things, of his opportunity to avoid the assessment of collection costs by paying or negotiating new terms for the loan and advising him of his right to challenge the amount of the principal or interest due or to meet with an agency representative to discuss what other options under current regulations may exist. If no response to such a letter is received, the delinquency may permit the assessment of collection costs as averaged based on a fixed percentage of principal and interest.

Third, and perhaps most importantly, to the extent the Trustee is arguing that ECMC's collection costs are not subject to the check and balance of a competitive market rate, he is wrong. It is important to remember that the regulation at issue, 34 C.F.R. § 682.410, calls for applying the lower of two alternatives in fixing the collection costs to be charged. Those two alternatives are: 1) the amount based upon the guarantor's actual costs as calculated utilizing the formula spelled out in 34 C.F.R. § 3060 (the make whole percentage rate); or, 2) the amount the debtor would be charged by the Department for collection costs on loans it holds. That second alternative is the market rate established by collection agencies who do actually submit competitive bids to provide a collection service to the Department. That competitive rate represents the maximum rate that a debtor can be charged; hence, the check and balance of a market rate is indeed present.

With respect to the Barnes loan, ECMC's rate of 18.06% for collection costs was lower than the "market set" 25% rate charged by the Department for collection on its loans. Consequently, had the Department retained the defaulted loan and pursued collection efforts on its own, the flat-rate percentage applicable for purposes of assessing collection costs would have been greater than that charged by ECMC. The fact that ECMC has not had to compete for assignment of delinquent loans in bankruptcy has had no demonstrable negative financial impact on borrowers in bankruptcy and is therefore of no particular relevance to the circumstances of the case. There is no basis for concluding that the regulation, 34 C.F.R. § 682.410(b)(2), is unconstitutional as administered by the Department.

## II. *Did ECMC Comply with the Regulation in Assessing Collection Costs Against the Barnes?*

In addition to the provisions regarding the calculation of collection costs, 34 C.F.R. § 683.410(b) implements the loan rehabilitation provisions of 20 U.S.C. § 1078–6. This, along with other rules of the Department, requires that before a loan is delinquent and collection costs are assessed, a guarantor must contact the borrower to offer an opportunity to rehabilitate the loan by voluntarily repaying it pursuant to new repayment terms that the borrower presumably can afford and which are also acceptable to the guarantor. 34 C.F.R. § 683.410(b)(5)(ii). Pursuant to 34 C.F.R. § 30.33(b)(4) (and 34 C.F.R. § 683.410(b)(5)(ii)), the notice provides a date by which the debtor must respond to the offer.

Six consecutive payments under such renegotiated terms renews the borrower's eligibility for additional assistance under the Federal Family Education Loan Program. 10 U.S.C. § 1078–6(b). Twelve consecutive payments rehabilitates the loan and allows it to be sold back to a lender. 10 U.S.C. § 1078–6(a)(1)(A).

The Trustee suggests that the Barneses' voluntary Chapter 13 plan which went unobjected to by ECMC and was approved by the bankruptcy court, is tantamount to the same type of voluntary repayment plan contemplated by the regulations implementing the loan rehabilitation provisions of 10 U.S.C. § 1078–6. Therefore, under those regulations, collection costs should not be charged.

The Trustee further maintains that, when read in conjunction with the language in paragraph 10 [10] of the promissory

---

**10.** Paragraph 10 of each promissory note provides as follows:

10. COLLECTION CHARGES. The Maker and any Endorser are liable for all

notes signed by David Barnes, because Title 34 C.F.R. § 683.410(b)(2) [11] limits the allowable collection costs to those actually incurred in collecting the loan, and paragraph 10 of the note requires that costs assessed must have been "necessary" for the collection of the loan, the flat-rate percentage assessment is impermissible.

The Trustee contends that ECMC is not only improperly assessing this amount, it is in actuality not even properly applying the "make whole" theory of the regulation because, under its agreement with the Department, ECMC is permitted to offset its actual costs of collection in Chapter 13 proceedings against a reserve fund owned by the government consisting of, among other things, the collections made by the guarantor. Despite the availability of those reimbursements, the Trustee argues ECMC nonetheless filed a proof of claim for the flat rate percentage of collection costs.

We regard this latter argument as the Trustee's weakest. Everything ECMC collects on loans, whether in bankruptcy or not, including the collection costs assessed, is deposited into a Federal Student Loan Reserve Fund. *See*, 20 U.S.C. § 1072a(a). ECMC then may charge back against the fund its costs of collection. There is no evidence of double-dipping here, as intimated by the Trustee, and, consistent with the clear intent of Congress, the Department is made whole since the costs of collection are borne by the borrowers, as opposed to the Department.

ECMC and the Secretary recognize that, pursuant to 34 C.F.R. § 683.410(b)(2), some loans may contain limitations on the amount of collection costs which may be charged to the borrower. According to ECMC and the Secretary, however, the limitations recognized by the regulations relate to gross amounts or percentage amounts, not to scope, referring us to the commentary to the regulation, published at 61 Fed.Reg. 60,477–60,-482.

■ Paragraph 15 of the Barnes promissory notes contains the limitation language relating to collection costs for which a borrower is responsible.[12] That limitation is 25% of the unpaid principal and accrued interest. Paragraph 10 of the promissory notes does not limit the amount of collection costs, but instead restricts the amount of attorney fees, requiring them to be statutorily authorized, permitted by regulation and necessary to the collection of the loan. No reasonable interpretation supports a view that "necessary" modifies "attorney fees," in the phrase "attorney fees that are permitted by Regulation and are necessary for the collection of the loan."

Finally, we address the Trustee's assertion that a voluntary Chapter 13 filing along with the resulting plan constitute the type of voluntary loan rehabilitation plan a

charges and collection costs, including statutorily authorized attorney fees that are permitted by Regulation of the Secretary and are necessary for the collection of the loan.

**11.** 34 C.F.R. § 683.410(b)(2) provides that collection charges are to be assessed according to the formula "[w]hether or not provided for in the borrower's promissory note and subject to any limitation on amount of those costs...."

**12.** Paragraph 15 of the Barnes promissory notes, provides in pertinent part:

15. CONSEQUENCES OF DEFAULT ... If this loan is referred for collection to an agency subject to the Fair Debt Collection Practices Act (15 U.S.C. §§ 1692 *et seq.*), Maker and endorser will jointly and severally pay those collection costs which do not exceed 25% of the unpaid principal and accrued interest.

guarantor is required to propose to a delinquent borrower prior to the assessment of collection costs. What the Trustee ignores in advancing this argument is that, while 34 C.F.R. § 682.410(b)(5)(ii) requires a guarantor to provide written notice to the borrower of his opportunity to enter into new terms for repayment and rehabilitate his status prior to assessing collection charges, Section 682.405 provides greater elaboration on loan rehabilitation, allowing the guarantor to agree to new terms only if the borrower responds to the written notice by requesting such rehabilitation. 34 C.F.R. § 682.405(b)(1). Here, the rehabilitation opportunities for the Barneses occurred long before the loan was assigned to ECMC, and, in fact, rehabilitation was never requested. The Barneses' subsequent Chapter 13 voluntary bankruptcy does not serve to revive that opportunity nor does it bar the assessment of collection costs; those costs became chargeable when the Barneses apparently failed to respond to the collection or rehabilitation efforts of the original guarantor, Great Lakes Higher Education Association.

Accordingly, we find that ECMC's assessment of collection costs was fully consistent with both the requirements and the intent of the applicable regulations.

### III. Is There a Conflict Between Department Regulations and the Bankruptcy Code?

Having determined that the regulation is neither unconstitutional on its face nor as applied by the Department, we are left with the final issue of whether it conflicts with bankruptcy law. The Trustee argues that 34 C.F.R. § 682.410(b)(2) conflicts with 11 U.S.C. § 502.[13] The Trustee contends that 11 U.S.C. § 502(b)(1) allows the bankruptcy court to make the ultimate determination of whether or not an assessment of costs is unreasonable, maintaining that legislative history in the form of the Notes of the Committee of the Judiciary, Senate Report No. 95–989 (1978), addresses the relationship of 11 U.S.C. § 502(b)(1) to this regulation. Reprinted at 1978 U.S.C.C.A.N. 5787, 5848, those notes provide in pertinent part:

> Paragraph (1) requires disallowance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration) other than because it is contingent or unmatured.

Thus, according to the Trustee, by referring to usury or unconscionability as the stated basis for a court to reject a claim, the legislature in enacting this statute clearly contemplated that reasonableness also was left to the court to decide.

ECMC and the Department counter by noting that "reasonableness" is not specified as one of the exceptions to the general rule expressed at § 502(a) that a claim be allowed. A usury defense would apply to a contractual claim for interest, not to a claim for costs available by federal regulation. Unconscionability and failure of consideration also are defenses to a contractu-

---

13. 11 U.S.C. § 502 provides in pertinent part:
§ 502. Allowance of claims or interests
(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.
(b) Except as provided in subsections (c)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
(1) such claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; ....

al claim, not to a claim based on federal regulation. However, the Trustee rejoins by noting that the obligation to pay collection costs arises under the loan contract entered into by Mr. Barnes which would make contractual defenses available.

Clearly, the Trustee has the right to recover the costs incurred in connection with collecting a delinquent loan where that obligation is rooted in the loan agreement itself. The regulation recognizes as much where it provides that collection charges are "subject to any limitation on the amount of those costs in the note." 34 C.F.R. § 682.410(b)(2). Similarly, we agree with the Trustee that unconscionability is a legal defense rooted in "reasonableness" or "unreasonableness", so that, if applicable, it would be available to halt an attempt to collect an unreasonable amount as collection charges. Even so, the Trustee's arguments do not extend to the situation at bar.

In this case, Mr. Barnes's notes provide in paragraph 15 that, as a borrower, he is liable for collection costs not exceeding 25% of the unpaid principal and accrued interest. Because the collection charges in ECMC's claim total only 18.06% of unpaid principal and accrued interest, in order for the Trustee to prevail, we would have to conclude both that the underlying government-approved student loan contract provision relating to consequences of default is unconscionable and that ECMC's 18.06% rate is unconscionable even though it is substantially less than the 25% rate established through competitive bidding and approved by the Department. There is no basis for such a conclusion on our part in law or in fact, and accordingly we hold that there is no conflict between the subject regulation and bankruptcy law.

## CONCLUSION

For the foregoing reasons, we determine that 34 C.F.R. § 682.410(b)(2) is not un-constitutional on its face or as applied and the Trustee's objection to ECMC's claim is thus overruled. This cause is remanded to the bankruptcy court, and the reference renewed, for further action consistent with this ruling.