In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1102

JOSEPH M. BLACK, JR., Trustee,

*Plaintiff-Appellant*,

*v.*

EDUCATIONAL CREDIT MANAGEMENT CORPORATION and
MARGARET SPELLINGS, Secretary of Education,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. NA4:00-241-C-B/S—**Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 19, 2005—DECIDED AUGUST 16, 2006

Before RIPPLE, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* The central issue in this case is whether a regulation promulgated by the Secretary of Education that allows the assessment of collection costs on defaulted student loans to be done on a formulaic basis was a permissible implementation of the governing statute, 20 U.S.C. § 1091a. The district court upheld the regulation, 34 C.F.R. § 682.410(b)(2), over the objection of a bankruptcy trustee, and accordingly allowed the claim for collection costs computed according to the regulation. The trustee appeals. We agree with the district court that the regulation was a permissible one, and we therefore affirm.

**I**

In 1987, North Shore Savings, a private financial institution, issued two Federal Family Education Loan Program (FFELP) loans, totaling $2,000 and $2,625, to David Barnes for truck driving school. Two years later, Barnes defaulted on the repayment of both loans. (At the time Barnes's loans were issued, a borrower was in "default" if the borrower failed to keep up with her monthly payments for 180 days; currently the time period for default is 270 days. See 20 U.S.C. § 1085(l)(1)). Under FFELP, the federal government subsidizes student loans issued by private financial institutions and guaranteed by state or private non-profit agencies and reinsures these loans for losses, such as those caused by a borrower's default. When Barnes defaulted, North Shore Savings filed a claim against the original guarantor of Barnes's student loans—the Great Lakes Higher Education Corporation (Great Lakes). Great Lakes paid the claim, took an assignment of Barnes's student loans, and was subsequently reimbursed by the United States Department of Education (the Department).

For approximately six years, Great Lakes unsuccessfully attempted to recover Barnes's student loan debt. In 1995, reporting that it was unable to collect the loan, Great Lakes assigned Barnes's student loans to the Department. The Department made further futile attempts at collection until November 15, 1999, when Barnes, along with his wife Nancy, filed for bankruptcy under Chapter 13 of the Bankruptcy Code.

On March 8, 2000, about four months after Barnes and his wife filed their Chapter 13 petition, the Department assigned Barnes's student loans to the Educational Credit Management Corporation (ECMC), a non-profit corporation that acts as a guarantee agency and occasionally handles the defaulted FFELP loans of debtors who file

a petition for relief under Chapter 13. Shortly after this assignment, ECMC filed an unsecured proof of claim in Barnes's bankruptcy proceeding for $9,108.01, which represented $7,714.88 in principal and interest on Barnes's two defaulted student loans and $1,393.13 in collection costs. The collection costs were approximately 18.06% of the $7,714.88 total of the principal and interest Barnes owed by then. (The district court indicated that collection costs were $1,394.08 as opposed to the $1,393.13 ECMC set forth in its proof of claim. Although nothing turns on the 95 cent difference, the district court should make this correction after it receives our mandate.) ECMC arrived at this figure by using the methodology prescribed in 34 C.F.R. §§ 6682.410(b)(2) and 30.60(c), which allows the use of a flat "make whole" rate, in lieu of actual collection costs in the particular case.

On April 17, 2000, Joseph Black, the Chapter 13 trustee, objected to ECMC's proof of claim in bankruptcy court. Although he did not dispute ECMC's claim for the principal and interest on the defaulted student loans, he argued that the assessment of collection costs calculated as a flat-rate percentage of Barnes's loan balance, as opposed to the actual costs ECMC incurred while attempting to collect Barnes's loan, was unreasonable and should not be allowed by the bankruptcy court. The flat rate was especially inappropriate, Black argued, because ECMC received the assignment of Barnes's loans four months *after* he filed his Chapter 13 petition and, thus it had made no prepetition collection efforts. In its response to the trustee's objection, ECMC defended both the accuracy of its calculations and its right to use the method set forth in the Higher Education Act (HEA), 20 U.S.C. § 1091a(b)(1) and its implementing regulation, 34 C.F.R. § 682.410(b)(2). Black replied that the regulation itself was "arbitrary, capricious, and manifestly contrary" to the HEA and thus could not be used.

On November 27, 2000, ECMC moved to withdraw reference from bankruptcy court, in accordance with 28 U.S.C. § 157(d), arguing that resolution of Barnes's objection to the proof of claim required consideration of federal statutes and regulations outside of the Bankruptcy Code. Although the district court initially denied ECMC's motion, it later took this step, reasoning that the issues Black had raised "require[d] the interpretation, as opposed to mere application, of the non-title 11 statute." *Matter of Vicars Ins. Agency, Inc.*, 96 F.3d 949, 954 (7th Cir. 1996). Shortly thereafter, the Secretary of Education intervened in the litigation to defend the regulation. The district court rejected Black's challenge and upheld the legality of 34 C.F.R. § 682.410(b)(2), concluding that the assessment of collection costs as a flat-rate percentage for borrowers in default was not arbitrary or manifestly contrary to the statute, which permits guaranty agencies to charge "reasonable collection costs." See 20 U.S.C. § 1091a(b)(1).

## II

The Higher Education Act, 20 U.S.C. §§ 1071 *et seq.*, established the federal Guaranteed Student Loan Program in the 1960s. Out of concern for the significant financial problems that defaulted student loans pose for the fisc, Congress enacted the Higher Education Amendments in 1986, which include a provision allowing guarantors to assess collection costs against borrowers in default. Specifically, the statute provides that "a borrower who has defaulted on a loan . . . shall be required to pay . . . reasonable collection costs." 20 U.S.C. § 1091a(b)(1). The statute has nothing further to say about the meaning of "reasonable collection costs." Instead, Congress left it up to the Secretary to interpret that term through regulations. See *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly

left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."). As the Supreme Court recently reiterated, "[d]eference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.' *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Otherwise, the interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.' *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)." *Gonzales v. Oregon*, 126 S.Ct. 904, 914-15 (2006).

Courts defer to legislative regulations like these unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). This is a narrow standard of review, under which our task is only to determine whether the agency's action "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 633 (7th Cir. 1995) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). If the agency "articulate[s] grounds indicating a rational connection between the facts and the agency's action, then our inquiry is at an end." *Id.*

In response to this delegation of authority, the Secretary issued 34 C.F.R. § 682.410, which establishes the basic rules for the assessment of collection costs against borrowers who have defaulted on their student loans. This regulation begins by providing that a "guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim." 34 C.F.R. § 682.410(b)(2). "These costs may include, but are not

limited to, all attorney's fees, collection agency charges, and court costs." *Id.* It then goes on to adopt a mathematical formula (the details of which are not important in this appeal) to determine the precise amount a guarantor may charge a borrower for collection costs. See 34 C.F.R. § 30.60. The key point for our purposes is that the Secretary allows guaranty agencies to charge borrowers a flat-rate percentage for collection costs that takes into account the total costs associated with the agency's entire defaulted student loan portfolio, as opposed to requiring the agency to track the individual charges associated with the collection of a particular borrower's account. The total collection costs for any borrower may not exceed the amount the same borrower would be charged for the cost of collection if the loan were held by the Department (which, at the time of this litigation, was a flat rate of 25% of the outstanding principal and interest, see 61 Fed. Reg. 47398-01 (1996)). Based upon ECMC's total collection expenses for 2000 (the year in which ECMC filed its proof of claim in Barnes's bankruptcy case), the formula yielded a flat rate of 18.06%. There is no dispute in this case that ECMC accurately calculated this rate using the formula in 34 C.F.R. § 30.60.

Black argues that 34 C.F.R. § 682.410(b)(2) is arbitrary, capricious, and manifestly contrary to the HEA because it allows guarantors to charge borrowers collection costs that take into account the agency's entire cost of collection for a given year, including the costs associated with those borrowers who cannot, or will never, repay their loans. Black urges that it is unfair to make borrowers who seek to repay their loan obligations responsible for the costs associated with the real deadbeats who never attempt to reconcile their accounts. Perhaps he is correct, as a matter of ultimate morality, but the real world does not operate this way. The price of merchandise in a store reflects the fact that some people shoplift; the rates associated with credit cards reflect the fact that some cardholders never pay

their bills. In these and countless other instances, the many who pay end up absorbing the costs for the few who do not. Black points to no provision in the HEA that requires guarantors to charge each borrower in default only the collection costs that the agency spent in attempting to collect his or her individual debt. Under Black's view, the costs of those who successfully evade collection efforts would ultimately be borne by the taxpayers. Such an outcome would conflict directly with the Secretary's interpretation of the HEA as mandating that the borrowers themselves, not the taxpayers, should bear the reasonable costs of collecting student loans in default. See 61 Fed. Reg. 60478-01 (1996). This policy strikes us as entirely consistent with the statute; thus, whether the Secretary's statement qualifies for full *Chevron* deference or the more qualified *Skidmore* respect, we find it well supported.

Although we could stop here, we note as well that testimony about the practical operation of the system from high-ranking Department officials also supports the Secretary. These individuals asserted that tracking the actual collection costs for individual borrowers would be extremely costly and at times infeasible. In attempting to collect student loan debts, guaranty agencies like ECMC have to send letters, make phone calls to borrowers, and conduct administrative hearings; in some cases, they must track down borrowers whose whereabouts are unknown or pursue litigation. Given the sheer number of borrowers whose federal loans are in default, it would be difficult and expensive for both the guaranty agencies and the Department to keep track of the individual costs associated with each borrower's account. There are a number of overhead costs that cannot readily be attributed to individual borrowers. Black minimizes these problems, arguing that it would not have been difficult to calculate the costs ECMC expended in attempting to collect Barnes's debt given that it was assigned Barnes's account after he filed his Chapter 13

petition. This assumes, however, that ECMC's costs are the only ones that are relevant, rather than the accumulated costs of its predecessors in interest. Moreover, this is an argument that a great many individual debtors could make. When considering the Secretary's entire default loan portfolio, it seems perfectly reasonable to us that the Secretary would choose to adopt a regulation that calls for the assessment of average, as opposed to individual, costs. Black may have a better method in mind for calculating collection costs, but we are not at liberty to "substitute [Black's or even our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844.

Similarly, at oral argument Black contended that it would be unreasonable for ECMC to collect an 18.06% fee for collection costs in Barnes's case, again pointing out that it did not take over Barnes's loans until after he filed for bankruptcy. As we have already remarked, however, Barnes's loans had been in default for almost a decade prior to the time he filed his Chapter 13 petition. Barnes should not be absolved from paying the years of collection costs associated with his account merely because the Department transferred his debt to the ECMC after he finally decided to repay his debts through the bankruptcy process. It is reasonable for the Secretary to assign the right to recover collection costs to one entity, rather than trying to distribute it up the chain, and the last holder of the debt is a rational one to choose. Compare *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977) (barring indirect purchaser lawsuits in antitrust actions).

In the alternative, Black argues that, at the very least, guaranty agencies should be required to consider separately the average costs associated with the accounts of the subset of loans in bankruptcy proceedings. He takes issue with the fact that in calculating its collection costs, ECMC considers only the costs associated with defaulted student loans that

are not in bankruptcy proceedings. According to Black, the Federal Claims Collection Standards (FCCS) regulation, 4 C.F.R. § 102.13(d)(1999) (which was in effect at the time Barnes filed his Chapter 13 petition, but has since been abrogated), provided that in assessing charges to cover the administrative costs incurred as a result of a delinquent federal debt, the costs "should be based upon actual costs incurred or upon cost analyses establishing an average of actual additional costs incurred by the agency in processing and handling claims against other debtors in similar stages of delinquency." Black takes the position that a Chapter 13 proceeding is a separate "stage of delinquency" and on that premise argues that this regulation required ECMC to calculate separately the average costs associated with those loans in Chapter 13 proceedings.

Even if this regulation were still in effect, we would defer to the Secretary's conclusion that bankruptcy is not a separate stage of delinquency for purposes of this regulation. In arguing to the contrary, Barnes seems to be confusing the terms "delinquent" and "default." A loan that is 15 days late would be delinquent, but would be in a different stage of delinquency than a loan that had not been paid in 270 days (the time period after which a loan is considered to be in default). We see nothing in this regulation that imposes an obligation on a guaranty agency to calculate separately the collection costs associated with loans in bankruptcy. We also note that the evidence in the record confirms that the collection costs ECMC incurred pursuing delinquent loans in bankruptcy proceedings were actually higher than the costs associated with those loans not in bankruptcy, because of the legal fees associated with bankruptcy proceedings. It is therefore not clear to us why Black wants guaranty agencies like ECMC to calculate collection costs in a manner that will likely result in higher collection charges being assessed to borrowers who have filed for bankruptcy.

Black's next point is that ECMC failed to establish a loan rehabilitation program for Barnes as required under 34 C.F.R. § 682.405, the regulation that implements the HEA's default reduction program, see 20 U.S.C. § 1078-6. Pursuant to this regulation, a guaranty agency must have in place a loan rehabilitation program for all borrowers in default through which the loan may be purchased by an eligible lender and removed from default status. See 34 C.F.R. § 682.405(a)(1). A loan in default is considered to be "rehabilitated" only after the borrower has voluntarily submitted 12 consecutive monthly payments to the guaranty agency and the loan has been sold to the eligible lender. See *id.* § 682.405(a)(2). After the loan has been rehabilitated, the borrower regains all FFELP benefits. See *id.* § 682.405(a)(3). Black contends that Barnes's loans qualified for rehabilitation because he submitted 12 consecutive payments to the bankruptcy trustee as specified in his confirmed Chapter 13 plan (to which ECMC did not file an objection). But ECMC never attempted to sell Barnes's loans to an eligible lender. If ECMC had done so, Black argues, the collection costs that would have been assessed, if any, would have been limited to those costs ECMC actually incurred in rehabilitating these loans over the 12-month period, as opposed to the 18.06% flat rate.

There are a number of flaws in Black's argument. First, as the Secretary points out, in order to take advantage of the rehabilitation process, the borrower must request rehabilitation from the guaranty agency. See 34 C.F.R. § 682.405(b)(1). The district court found that Barnes never made such a request, and we have no reason to find clear error in that finding of fact. Given that Barnes's student loans had been in default since 1989, the district court also found that his rehabilitation opportunities expired long before the loan was assigned to ECMC.

It is not clear whether a borrower in default can rehabilitate her loans through a Chapter 13 proceeding. On the one

hand, during oral argument ECMC was reluctant to take the position that a defaulted loan could *never* be rehabilitated in a Chapter 13 proceeding; on the other hand, it argued that such an action would be an "unusual scenario" because some features of Chapter 13 are not entirely consistent with HEA's rehabilitation provisions and implementing regulations. For example, a loan is rehabilitated only upon its sale to an eligible lender. Given that the applicable regulations require a lender to suspend collection efforts outside a bankruptcy proceeding and submit a proof of claim for payment in the bankruptcy court, see 34 C.F.R. § 682.402(f)(2)(i); (f)(4), a guaranty agency could sell a loan owed by a defaulter in a Chapter 13 proceeding only under the supervision of the bankruptcy court, at least until the proceeding has been completed. More importantly, even if Barnes's student loans could have been rehabilitated through the Chapter 13 proceeding, Black is incorrect in his assumption that the collection costs assessed to Barnes would only have been ECMC's proportionate share of the monthly payments under the plan actually necessary to rehabilitate the loan. Nothing in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation. To the contrary, the statute explicitly provides that "[a] guaranty agency may charge the borrower and retain collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of sale of a loan rehabilitated." 20 U.S.C. § 1078-6(a)(1)(C). Thus, even if Barnes's loans could have been rehabilitated through his Chapter 13 proceeding, the 18.06% that ECMC charged Barnes for collection costs falls within the bounds of what is allowed under the HEA's loan rehabilitation provisions.

Finally, at oral argument, Black accused ECMC of failing to comply with 34 C.F.R. § 682.410(b)(5)(ii), which details a guaranty agency's administrative obligations under the HEA. That regulation requires a guaranty agency

to take a number of steps "before it reports [a borrower's] default to a credit bureau or assesses collection costs against a borrower." These steps include written notice to the borrower about the proposed actions, *id.* § 682.410(b)(5)(ii)(A), "[a]n opportunity to inspect and copy agency records pertaining to the loan obligation," *id.* § 682.410(b)(5)(ii)(B), "[a]n opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation," *id.* § 682.410(b)(5)(ii)(C), and "[a]n opportunity to enter into a repayment agreement on terms satisfactory to the agency," *id.* § 682.410(b)(5)(ii)(D). Black wants to argue that there is no evidence that ECMC (or any of its predecessors) met any of these requirements. He neither raised this issue before the district court, however, nor did he develop it in his initial brief on appeal, and so it is waived. See, *e.g., Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 867 (7th Cir. 2005) (per curiam) ("Arguments that first appear in a reply brief are deemed waived.").

Accordingly, the district court's judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*