MANION, Circuit Judge,
concurring in part and dissenting in part.
I agree with the court’s conclusion that Bible’s claims are not preempted, but I disagree that she pleaded a valid breach of contract or RICO claim. As a matter of law, United Student Aid Funds, Inc., did not breach the Master Promissory Note (MPN) and did not commit the fraud upon which Bible’s RICO claim is predicated. Bible’s entire theory is erected atop an erroneous equivocation, that the loan rehabilitation agreement of 34 C.F.R. § 682.405 is the same as the repayment agreement of § 682.410. I say Bible’s theory because it truly is her own contrivance. There is no evidence to suggest that the Department of Education ever interpreted the regulations in the manner advanced by Bible prior to our request for an amicus brief in this case. In fact, the record reflects that the Department agreed with USA Funds’ interpretation and had no cause to question USA Funds’ regulatory compliance, that is, until the Department filed its amicus brief. Applying the Department’s post hoc rule to USA Funds is both wrong and unjust. The fraud is on the guarantors and, because the Department ultimately guarantees the loans, on the taxpayer. For this and for the detailed reasons that follow, I respectfully dissent.
A. Background
Before setting out my analysis and rebuttal to Bible’s arguments and the court’s opinion, it is important to understand what this case is about and how the court and I came to disagree. I provide the following *664 background as a means of presenting the big picture.
To obtain a student loan, Bible entered into a loan agreement with Citibank. At some point she quit making payments. After about nine months of nonpayment (270 days), Citibank declared her loan in default. USA Funds, the guarantor, stepped forward and “bought” the loan. USA Funds’ agent, General Revenue Corp. (GRC), offered Bible several options.[1] The first option was to pay the loan in full. Unable to pay the full amount, she declined that option. The second option, which was offered at the same time, would have given her a new payment plan that perhaps would have lowered her monthly payments and stretched out the repayment period, or she could have negotiated a lower amount. Had she exercised the first option, she would not have incurred costs nor would have the credit reporting agencies been notified of her default. Had she exercised the second option, she would have incurred costs, but would have avoided notification to the credit reporting agencies of her default. As with the first option, Bible did not have the wherewithal to exercise the second option. The third option, which was offered at the same time as the first two that she refused, was to enter into a rehabilitation agreement whereby USA Funds would sell her loans to a new lender who would establish a new repayment schedule, her default would be eliminated, and her costs capped at 18.5% of her outstanding balance.
Bible and her lawyers chose the third option and entered into negotiations for a loan rehabilitation agreement. After several days of negotiations, Bible agreed to enter into the loan rehabilitation process by signing an agreement to do so. At the time of signing, Bible had accrued no collection costs. That is why the chart in the court’s opinion shows zero costs. But from that time forward, costs would accrue.
To show her good-faith intention to rehabilitate her loans, Bible agreed to make monthly payments in the amount of $50.00 for a period of nine or ten months. At the end of that period, she would have shown her good faith and willingness to abide by a new repayment schedule. It should be noted that the $50.00 payments were by no means sufficient to cover the amount due each month. Rather, the payments could only cover about one-half of the interest that accrued over the rehabilitation period. After the nine- or ten-month period of good-faith payments, Bible was eligible for a new loan repayment schedule for an amount that included outstanding principal and accumulated interest and costs. The latter amounts would be capitalized into the new loan total when USA Funds sold the loan to a new lender. As best we know at this juncture, Bible’s loans were sold to a new lender and, according to the court, she is current on payments under the new schedule.
The dispute in this case is confined to the issue of costs. As indicated above, when she entered into the rehabilitation agreement no costs had yet accrued. However, from that time forward, costs accrued. Presumably these costs resulted from USA Funds “buying” Bible’s loans from Citibank, corresponding and negotiating with Bible over several days, preparing her loans for resale, finding a buyer, and finalizing the sale of her loans. Presumably, this process occurred during the *665 nine or ten months that Bible was making the good-faith payments of $50.00.
Bible now insists that USA Funds should not have charged her costs for this process. But that flies in the face of the statute, which expressly permits costs so long as they are limited to 18.5% of the new loan total. She relies instead on a novel theory that would grant her a complete exemption from costs despite the plain language of the statute. Based on her interpretation, Bible claims that USA Funds breached her loan contract and committed fraud sufficient to violate the RICO Act. But as I will demonstrate in detail below, there was no breach of contract and absolutely no fraud committed when she accepted loan rehabilitation. There is certainly no RICO violation. The court implies this by its very mild recognition of the RICO claim simply because it was recited in the complaint.
The only saving grace that the court falls back on, if there is such a thing in this case, is that the Department has submitted, at the court’s invitation, an amicus brief. But that brief establishes a brand new interpretation that was not present when the events of this case unfolded. Aside from the fact that the law is not ambiguous and the Department’s interpretation is unreasonable, the fact that there was no notice and opportunity to oppose the Department’s substantial “revision” gives us a very good reason not to defer to the Department’s interpretation.
B. Bible’s theory relies on two fundamental errors.
With the big picture now before us, I start my analysis with the Department’s new interpretation, that is, Bible’s theory. Section 682.410(b)(2) requires the guarantor to “charge a borrower an amount equal to reasonable costs incurred by the agency in collecting a loan.” Bible’s interpretation, now endorsed by the 'Department, is that a guarantor must charge a borrower “reasonable costs” except when the borrower agrees to loan rehabilitation within 60 days of being offered the opportunity and honors the agreement. Bible relies on the regulation’s requirement that the guarantor not charge collection costs until it offers the borrower certain opportunities, chief among them the “opportunity to enter into a repayment agreement on terms satisfactory to the agency.” § 682.410(b)(5)(ii)(D).
There are two fundamental errors with Bible’s theory. First, the regulation’s waiting period for charging costs applies to a different kind of repayment agreement than a rehabilitation agreement. Second, the regulation does not contain an exception to charging costs for any kind of repayment agreement, let alone a rehabilitation agreement. Only by relying on these errors is it possible for Bible to argue that USA Funds’ assessment of collection costs was a breach of contract and that USA Funds’ letter reporting Bible’s current collections costs as zero was fraudulent.
The correct interpretation is this: the rehabilitation agreement is not the same as the “repayment agreement on terms satisfactory to the agency” mentioned in the administrative regulation. The two are separate, and the regulations governing each are also separate, even though the guarantors’ current practice is to offer a defaulted borrower a rehabilitation agreement at the same time they offer her a repayment agreement. To avoid collection costs and a report of default, the borrower must choose the repayment agreement and either pay her balance in full or come to “terms satisfactory to the agency” that do not include collection costs. The alternative rehabilitation agreement is not a “repayment agreement *666 on terms satisfactory to the agency,” and accepting it does not allow the borrower to escape collection costs and default reporting. Rather, by agreeing to loan rehabilitation instead of loan repayment the borrower incurs costs and her default is reported, but her costs will be capped at 18.5% and her default will be cleared from her credit report if she successfully completes loan rehabilitation.
C. Loan repayment, not loan rehabilitation, offers defaulted borrowers the opportunity to avoid collection costs and default reporting.
Although Bible accepted neither loan repayment in full nor repayment through another agreement, it is necessary to review how loan repayment works in order to understand Bible’s errors. Once a borrower is in default, by failing to make a monthly payment for nine months (270 days), 20 U.S.C. § 1085(2); 34 C.F.R. § 682.200(b)(1), the lender hands the loan over to the guarantor who pays the default claim. Under 34 C.F.R. § 682.410, the guarantor then has 45 days to provide the borrower with a written notice and opportunities to inspect the loan records, request an administrative review, and “enter into a repayment agreement on terms satisfactory to the agency.” § 682.410(b)(5)(ii) & (6)(ii). The guarantor may not assess any collection costs against the borrower or report the borrower’s default to the credit reporting agencies until it provides the borrower with the notice and opportunities. § 682.410(b)(5)(h). The notice must, among other things, “[d]emand that the borrower immediately begin repayment of the loan,” explain “that all costs incurred to collect the loan will be charged to the borrower,” and explain the opportunity “to reach an agreement on repayment terms satisfactory to the agency to prevent the agency from reporting the loan as defaulted to consumer reporting agencies.” § 682.410(b)(5)(vi)(D), (E) & (G). Sixty days after the guarantor has sent the notice, if the borrower has not “reach[ed] an agreement on repayment terms satisfactory to the agency to prevent the agency from reporting the loan as defaulted,” then the guarantor “shall” report the borrower’s default to all national credit reporting agencies. § 682.410(b)(5)(i); cf. 20 U.S.C. § 1080a(c)(4) (requiring only a 30-day wait before reporting default).
If the borrower agrees to a repayment agreement sufficiently acceptable to the guarantor for the guarantor to not report the default, then the guarantor will not report the borrower’s default to all the national credit reporting agencies. 34 C.F.R. § 682.410(b)(5)(vi)(G); 20 U.S.C. § 1080a(c)(4). Although the borrower may avoid the report of her default in this way, she is still in default and therefore must pay collection costs: “a borrower who has defaulted on a loan made under this subchapter ... shall be required to pay ... reasonable collection costs[.]” 20 U.S.C. § 1091a(b)(l). So, although the guarantor is prevented from charging collection costs before it provides the notice and opportunities, 34 C.F.R. § 682.410(b)(5)(ii), it is required to charge collection costs afterwards. Again, “the guaranty agency shall charge a borrower an amount equal to reasonable costs incurred by ’ the agency in collecting.” § 682.410(b)(2). That said, the guarantor has the discretion to not charge collection costs under a repayment agreement because the repayment agreement is “on terms satisfactory to the agency.” § 682.410(b)(5)(ii)(D). Thus, the borrower may avoid collection costs either by ensuring that th.e guarantor does not incur collection costs, that is, by paying the loan balance in full upon the guarantor’s demand for payment, or by coming to “terms *667 satisfactory to the agency” that do not include collection costs. Id.
Obviously, a “repayment agreement on terms satisfactory to the agency” requires, at most, payment in full of the outstanding balance and, at least, terms that actually stand a chance of paying off the loan. § 682.410(b)(5)(ii)(D). If the borrower pays her outstanding balance in full, then she avoids the report of default and collection costs. If she is unable to pay in full, but comes to terms that do not include collection costs, then she also avoids the report of default and collection costs. If she cannot reach such favorable terms but can still reach a repayment agreement, then she avoids the report of default but not collection costs. Finally, if the borrower declines to accept a repayment agreement (perhaps she cannot afford one), then, according to the regulations, the guarantor reports the borrower’s default to the national credit reporting agencies and charges collection costs. § 682.410(b)(5)®; § 682.410(b)(2).
D. Loan rehabilitation is a separate opportunity, after a borrower has rejected loan repayment, to remove the loan from default status and erase the report of default.
Yet, for a borrower like Bible who cannot afford repayment there is a way out: loan rehabilitation. Loan rehabilitation is a separate program, § 682.405, for those borrowers who are unable to meet the stricter repayment obligations of § 682.410. It requires only payments that the borrower can afford; it removes the loan from collection, clears the default from the borrower’s credit history, and limits collection costs to 18.5% (now 16%) of the loan’s outstanding balance and accrued interest. 20 U.S.C. § 1078-6; 34 C.F.R. § 682.405. It is a lengthy process and takes as long as it took to get into default (nine months) but it allows the borrower time to get back on her feet. Id. However, loan rehabilitation will incur the report of default and collection costs. This is because it is only available to a borrower whose default has been (or will be) reported and whose loan is in collection, in other words, a borrower who has rejected a repayment agreement satisfactory to the guarantor.
While the post-2006 regulations may describe loan rehabilitation as a type of monthly repayment agreement (explained below), it is not “a repayment agreement on terms satisfactory to the agency” because it is not a repayment agreement that can repay the loan. § 682.410(b)(5)(ii)(D). Loan rehabilitation requires that the borrower voluntarily make nine out of ten monthly payments (which can be as little as $5.00) to demonstrate the borrower’s good-faith intention to repay the loan. § 682.405(b)(l)(iii). The nine token payments alone are insufficient to rehabilitate the loan, because the loan must be sold to a new lender for it to be considered rehabilitated. § 682.405(a)(2)(h). Only after the loan is sold to a new lender who establishes a new repayment schedule is the loan rehabilitated and back in a standard repayment status. § 682.405(b)(4). Thus, because a loan in the process of rehabilitation is still in default and under collection until it is sold to a new lender, “[a] guaranty agency may charge the borrower and retain collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of sale of a loan rehabilitated®” 20 U.S.C. § 1078-6(a)(1)(C) (effective July 1, 2006).
E. Loan rehabilitation is not loan repayment.
Central to Bible’s theory is her claim that the rehabilitation agreement of 34 C.F.R. § 682.405 is the repayment agree *668 ment in 34 C.F.R. § 682.410(b)(5)(ii)(D). It is not. Although § 682.405(a)(2) states that “[a] loan is considered to be rehabilitated only after [t]he borrower has made and the guaranty agency has received nine of the ten qualifying payments required under a monthly repayment agreement,” this is merely a description, not a definition. It does not allow the term “repayment agreement” in § 682.410 to be replaced with “rehabilitation agreement.” A rehabilitation agreement may be a type of repayment agreement, but it is not the “repayment agreement on terms satisfactory to the agency” required by § 682.410(b)(5)(ii)(D).
There are several reasons why the two agreements are not the same. First, it is apparent from their differing levels of discretion. Section 682.410 requires that the guarantor offer a repayment agreement “on terms satisfactory to the [guaranty] agency.” § 682.410(b)(5)(ii)(D). Quite obviously, whether the terms of a particular agreement are satisfactory to the guarantor is largely a matter of the guarantor’s discretion. The Department agrees with this. Gov’t. Amicus Br. 8, 15. On the other hand, the terms of a rehabilitation agreement are mandated by § 682.405(b)(1). The amount and timing of each payment are defined by the regulation, and “[t]he agency may not impose any other conditions unrelated to the amount or timing of the rehabilitation payments in the rehabilitation agreement.” § 682.405(b)(l)(i)-(vi). According to Bible, every rehabilitation agreement must be a repayment agreement satisfactory to the guarantor because the guarantor accepts each agreement. But even that is mandated by the regulation: “A guaranty agency ... must enter into a loan rehabilitation agreement with the Secretary. The guaranty agency must establish a loan rehabilitation program for all borrowers with an enforceable promissory note for the purpose of rehabilitating defaulted loans.... ” § 682.405(a)(1).
Second, the history of the regulations also demonstrates that they are not the same. Section 682.405(a)(2) did not describe the rehabilitation agreement as a “repayment agreement” until September 8, 2006, but § 682.410 always used the term.
Third, a guarantor is prevented from both charging collection costs and reporting the default until it provides the borrower with the opportunity to enter into a repayment agreement satisfactory to the guarantor. § 682.410(b)(5)(ii). If a rehabilitation agreement necessarily is a repayment agreement satisfactory to guarantor, so that the guarantor is prevented from charging collection costs, then the guarantor would also be prevented from reporting the default. Yet, one of the primary purposes of loan rehabilitation is to clear the report of default from the borrower’s credit history, including the default reported by the guarantor, which the guarantor must do once loan rehabilitation is complete. § 682.405(b)(3)©; 20 U.S.C. § 1078-6(a)(1)(C). If timely acceptance of a rehabilitation agreement prevented collection costs, then it should also prevent default reporting. But if it prevented default reporting, then one of the primary purposes of loan rehabilitation would be pointless. Obviously, Bible does not argue that the timely acceptance of loan rehabilitation prevents the report of default because it would be absurd.
Fourth, it is unreasonable to hold that a rehabilitation agreement is “satisfactory to the agency” for actual repayment of the loan. Id. The loan rehabilitation’s “monthly repayment agreement” is only part of the agreement. The nine token payments are used to prove the borrower’s good-faith intention to repay the loan once it is purchased by a new lender, not to repay *669 the loan to the guarantor. It is the new lender that sets the actual repayment schedule that will repay the rehabilitated loan. 34 C.F.R. § 682.405(a)(2)(ii), (b)(4). In Bible’s case the loan rehabilitation payments did not even cover the interest accruing on her loans.
F. The Barnes/Black litigation does not support Bible’s theory that loan rehabilitation is loan repayment.
The Department’s brief in Ed. Credit Mgmt. Corp. v. Barnes, 318 B.R. 482 (S.D.Ind.2004), aff'd sub nom. Black v. Educ. Credit Mgmt. Corp., 459 F.3d 796 (7th Cir.2006), does not support Bible’s theory. Bible misrepresents the Department’s brief in Barnes just as she does the regulation’s description of a rehabilitation agreement. In Barnes, the Department intervened in a bankruptcy proceeding to defend 34 C.F.R. § 682.410(b)(2), the section of the regulation that allows a guaranty agency to charge collection costs based on a flat-rate formula. The Department was defending the regulation from the bankruptcy trustee’s challenge that the use of the flat-rate formula for charging collection costs was arbitrary and capricious. Bible relies on a particular passage from the Department’s brief:
Department rales require the guarantor who acquires a loan by reason of the default of the borrower (...) to charge collection costs only after providing the debtor an opportunity to contest the debt and to enter into a repayment arrangement for the debt. 34 C.F.R. § 682.410(b)(5). The guarantor, moreover is not bound by the original loan repayment schedule, but can agree to any repayment arrangement that debtor can afford, regardless of the amount of time needed to pay the debt off under that arrangement. See 20 U.S.C. § 1078-6(a) (defaulter may have loan rehabilitated and default status cured after 12 installment payments to the guarantor); § 10786(b) (defaulter may regain eligibility for new student aid after six reasonable and affordable payments based on the borrower’s total financial circumstances).
The regulations therefore direct guarantors to charge collection costs only to those debtors who cause the guarantor to incur collection costs by failing to agree promptly to repay voluntarily.
Appellant’s App. 55 (emphasis added; last emphasis in original).
As part of its much larger effort to prove that the regulation’s use of a flat-rate formula was reasonable, the Department briefly explained that the same regulation allowed borrowers to avoid collection costs if they promptly agreed to repay voluntarily. In its explanation, the Department was clearly referring to the repayment agreement of § 682.410, not the rehabilitation agreement of § 682.405, as is evident from the briefs straightforward citation to § 682.410(b)(5). The Department went on to explain that the guarantor is not bound in a repayment agreement by the original repayment schedule. According to Bible, because the Department supported this subsequent proposition with a citation to the loan rehabilitation statute, 20 U.S.C. § 1078-6, the Department was somehow explaining that a guarantor is prevented from charging collection costs if a borrower timely accepts a rehabilitation agreement. It was not.[2]
*670 When we affirmed Barnes, we held that the Higher Education Act (HEA) expressly allows a guarantor to impose collection costs on rehabilitated loans:
Nothing in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation. To the contrary, the statute explicitly provides that “[a] guaranty agency may charge the borrower and retain collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of sale of a loan rehabilitated.” 20 U.S.C. § 1078 — 6(a)(1)(C). Thus, even if Barnes’s loans could have been rehabilitated through his Chapter 13 proceeding, the 18.06% that ECMC charged Barnes for collection costs falls within the bounds of what is allowed under the HEA’s loan rehabilitation provisions.
Black, 459 F.3d at 803. In so holding we did not disagree with the Department’s interpretation of its rules. On the contrary, we agreed with the Department, which then told us in its brief:
Furthermore, the Trustee’s argument rests upon a mistaken assumption that rehabilitation would have enabled Barnes to pay lower collection costs.
The Trustee suggests that, if Barnes has rehabilitated his loan, ECMC could not have assessed collection costs at a flat rate. According to the Trustee, ECMC could have recovered only the actual costs that it incurred in collecting Barnes’ student loan during the period leading up to rehabilitation.
But the regulation governing rehabilitation plainly allows a guaranty agency to assess collection costs at a flat rate as long as the rate does “not exceed” 18.5 percent. See 34 C.F.R. § 682.405(b)(l)(iv).
Br. for Appellee Secretary of United States Department of Education, Black, 459 F.3d 796, 2005 WL 3738503, at 33 (citation omitted). Neither we nor the Department recognized a special exception that would have prevented a guarantor from charging a borrower collection costs on rehabilitated loans. We plainly said that “[njothing in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation.” Black, 459 F.3d at 803 (emphasis added). Nothing in the Barnes/ Black litigation supports the theory that Bible, and now the Department, advances.[3]
*671 G. The regulation’s collection-cost provisions contain no exemption for rehabilitated loans.
Bible’s theory is contrary to the plain language of the statutes and regulations because nowhere do the statutes and regulations contemplate that “reasonable costs” equals “no costs” for borrowers who timely enter into a rehabilitation agreement. See 20 U.S.C. §§ 1078-6, 1091a; 34 C.F.R. §§ 682.405, 682.410. That is why we held in Black that “[njothing in the HEA prohibits a guaranty agency from assessing collection costs as a flat-rate percentage upon rehabilitation.” Black, 459 F.3d at 803 (emphasis added). The regulation’s only exception for collection costs refers to limiting collection costs to 18.5% on rehabilitated and consolidated loans. § 682.410(b) (ii) (2) (“Except as provided in §§ 682.401(b)(18)(i) and 682.405(b)(l)(iv)(B)”). Plainly, collection costs cannot be limited on rehabilitated loans unless they are first allowed.
Bible’s theory tries to explain this incongruity by saying that the regulations’ references to collection costs refer to those borrowers who fail to timely agree to loan rehabilitation, or fail to honor the agreement. This cannot be the case. First, the regulations’ references to collection costs do not refer to a borrower who fails to honor the rehabilitation agreement because the limitation applies “at the time of the loan sale,” 20 U.S.C. § 1078 6(a)(l)(D)(i)(II)(aa), and the loan cannot be sold unless the borrower honors the rehabilitation agreement, § 1078-6(a)(l)(A). Second, and more importantly, the references do not refer to a borrower who fails to agree to loan rehabilitation within the 60-day deadline because there is no deadline for loan rehabilitation.
The regulatory scheme does not require that a guarantor offer loan rehabilitation, only that the guarantor have a program where “[a] borrower may request rehabilitation of the borrower’s defaulted loan held by the guaranty agency.” § 682.405(b)(1) (emphasis added). It was not until 2010 that the regulation was amended to require guarantors to “[i]nforrn the borrower of the options that are available to the borrower to remove the loan from default, including an explanation of the fees and conditions associated with each option.” § 682.410(b)(5)(vi)(M) (effective July 1, 2010; emphasis added). -When the Department finalized the regulations in 2006, they said, “We believe the regulations accurately reflect the HEA and Congressional intent. Borrowers must request, or in some fashion initiate, loan rehabilitation so that the period during which the 9 qualifying payments must be made is clear for both the guaranty agency and the borrower.” 71 Fed.Reg. 64389 (Nov. 1, 2006) (emphasis added).
Thus, the regulations do not require a guarantor to offer rehabilitation, but merely to make rehabilitation available. If there is no requirement to offer rehabilitation, and therefore no deadline, then there is nothing to gauge whether a borrower has “timely” or “promptly” entered into a rehabilitation agreement. This is the whole reason for Bible’s equivocation between a rehabilitation agreement and a repayment agreement satisfactory to the guarantor. Bible needs the repayment agreement’s deadline to create the special category of borrowers who “promptly” en *672 ter into rehabilitation agreements. But as I have explained at length above, the rehabilitation agreement of § 682.405 is not a repayment agreement satisfactory to the guarantor of § 682.410. Without Bible’s fictitious special category, the regulations allow costs on rehabilitated loans without exception.
Simply put, nowhere do the statutes or regulations say that collection costs may be assessed except when, or unless, the borrower timely agrees to loan rehabilitation and honors that agreement. Bible’s interpretation would turn loan rehabilitation into a kind of at-will deferment. A borrower could make no payment on her loans for nine months and then make only token payments for another nine months, all without collection costs, only to have her loan purchased by a new lender and the default erased from her record. This was not what Congress intended. As explained by the Department in 2006:
We believe the regulations accurately reflect the HEA and Congressional intent. ... Additionally, a reasonable and affordable payment amount needs to be established, and the consequences of loan rehabilitation, such as the addition of collection costs to the rehabilitated loan amount, the post-rehabilitation payment period and the likely increased payment amount, need to be explained to the borrower.
71 Fed.Reg. 64389 (emphasis added).
H. Bible takes advantage of the guarantors’ practice of offering loan rehabilitation at the same time as loan repayment.
Bible obfuscates the regulations in another way. She takes advantage of the fact that USA Funds offered her loan rehabilitation at the same time as it offered her loan repayment. The regulations do not require that the guarantor immediately offer a defaulted borrower loan rehabilitation. Nevertheless, the current practice — at least as practiced by USA Funds in this case — appears to be for the guarantor to offer loan rehabilitation at the same time it offers loan repayment. The Department endorses this method of giving the borrower a choice. Its website states:
You have several options for getting your loan out of default. These include
• loan repayment
• loan rehabilitation, and
• loan consolidation.
Addendum to Appellee’s Response to Gov’t Amicus Br. The Department clearly describes loan repayment and loan rehabilitation as separate options and gives the impression that they are options provided concurrently. (Loan consolidation is also a separate option, but is not at issue in this case.) The Department’s description of loan repayment does not mention collection costs, whereas its description of loan rehabilitation does. Id. (“Outstanding collection costs may be added to the principal balance.”). The Department’s description of loan rehabilitation includes collections costs because the regulations allow them. 71 Fed.Reg. 64389 (“the consequences of loan rehabilitation, such as the addition of collection costs to the rehabilitated loan amount ... need to be explained to the borrower”).
When a guarantor offers loan rehabilitation at the same time as loan repayment there is an incentive for the borrower to choose loan rehabilitation because it. is less expensive in the short term. But by choosing loan rehabilitation, the borrower necessarily rejects loan repayment. Because the borrower rejects loan repayment, the guarantor must report the default and assess collection costs. And, remember that the guarantor is prohibited from charging collection costs before offering loan repayment. So, when the *673 guarantor offers loan rehabilitation at the same time as loan repayment it is not allowed to assess collection costs until the borrower chooses loan rehabilitation, thereby rejecting loan repayment. If the borrower has not previously defaulted, then collection costs will be zero when loan rehabilitation is offered.
This practice is entirely permissible under the regulations as long as the guarantor meets the separate requirements for each option. Borrowers are not harmed by the practice, so long as they receive the necessary warnings regarding collection costs and other consequences. As can be seen from an examination of GRC’s correspondence with Bible, this was the practice followed here.
I. Bible fails to state a claim for either breach of contract or RICO because USA Funds and GRC complied with the regulations.
The default letter sent by GRC to Bible stated: “Without a dispute, failure to pay the account in full, agree to a satisfactory repayment arrangement, or utilize another recovery option as outlined on the attached insert, may result in additional collection efforts.” Appellant’s App. 13Í. At the top of the attached insert was a call-out box which stated in bold type: “If you are unable to pay in full the outstanding balance on your defaulted loan(s), call a representative to find out which of the following additional options you qualify for.” Id. at 133. The insert then listed three additional options: 1) “Alternative Payment Arrangements,” 2) “Loan Rehabilitation,” and 3) “Loan Consolidation.” Id.
The first option, “to pay in full the outstanding balance on [the] defaulted the loan(s)” and the additional option, “Alternative Payment Arrangements,” were both the “repayment agreement on terms satisfactory to the agency” of § 682.410. By paying the outstanding balance in full, Bible would have avoided collection costs and the report of de-fault.[4] By choosing “Alternative Payment Arrangements,” Bible would have avoided the default but not collection costs. USA Funds’ description of the “Alternative Payment Arrangements” stated that “[a] portion of each payment received from you will be allocated to pay collection costs.” Id. But Bible chose neither of those options. Instead of choosing loan repayment, Bible chose loan rehabilitation, which USA Funds described as “the opportunity to resolve a loan default and improve your credit record by removing the guarantors’ report of your loan default.” Id. GRC also informed Bible that “[a]s part of your eligibility for loan rehabilitation, you will be assessed collection costs at a reduced rate of 18.5% of the outstanding balance at the time your loan is purchased by an eligible lender, and the purchasing lender may add these costs to your outstanding loan principal.” Id. (emphasis added). By choosing loan rehabilitation Bible rejected loan repayment, thereby incurring the collection costs permitted under the statutes and regulations.
Both the default letter and the loan rehabilitation application letter listed Bible’s current collection-cost balance on each of her four loans as zero because it was. Appellant’s App. 132, 137. USA Funds was prohibited from charging collection costs until Bible acted on its offer of loan *674 repayment, or the offer expired. 34 C.F.R. § 682.410(b)(5)(H). Had Bible paid her account in full she would have avoided collection costs, but she did not, she chose loan rehabilitation. When she chose loan rehabilitation she rejected loan repayment and collection costs began accruing. By choosing loan rehabilitation Bible agreed “that the lender may capitalize collection costs of 18.5% of the outstanding principal and accrued interest upon rehabilitation of my loan(s).” Appellant’s App. 139.
USA Funds abided by the statutes and regulations. USA Funds neither breached the contract nor committed fraud. For this reason, Bible’s breach of contract claim and RICO claim should be dismissed.
J. We cannot give deference to the .Department’s interpretation because the statutes and regulations unambiguously allow collection costs and because the Department’s interpretation is unreasonable, inconsistent with prior interpretations, and without warning.
The Department — in response to our request for an amicus brief — claims that it has always interpreted its regulations to provide an exception to collection costs when a borrower promptly enters into a rehabilitation agreement and complies with that agreement. It also claims that its interpretation deserves deference under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Edüd 79 (1997).
The Department’s interpretation is not entitled to deference. First, Congress may have left it up to the Department to define “reasonable collection costs,” but the Department has already clearly defined the term, 34 C.F.R. §§ 682.410(b)(2)®, 682.405(b)(l)(vi)(B), and we need look no further. The regulations define “reasonable collections costs” with a flat-rate formula that must be capped at 18.5% of the principal and accrued interest for rehabilitated loans. Id. See also Department’s letter to guaranty agency directors, infra at 674-75. The definition the Department now advocates does not comport with those regulations. Instead, the Department’s interpretation amounts to a new rule that determines when costs'will be charged for rehabilitated loans, not what those costs will be. That was not a gap “explicitly left [ ] for the agency to fill.” Chevron, 467 U.S. at 843, 104 S.Ct. 2778. Congress stated quite explicitly that a guarantor may charge the borrower collection costs on a rehabilitated loan. 20 U.S.C. § 1078-6(a)(l)(D)(i)(II). We are not allowed “to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation.” Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Edüd 621 (2000). Because the regulation is not ambiguous regarding collection costs for rehabilitated loans, and because the Department’s interpretation is plainly erroneous and inconsistent with the regulation, it is not entitled to deference. Id.; Auer, 519 U.S. at 461,117 S.Ct. 905.
Moreover, the Department’s amicus brief demonstrates that its interpretation is entirely new and inconsistent with its prior interpretations. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (“an agency’s interpretation of a statute or regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view” (quotation marks omitted)). The Department’s reasoning appears to be taken wholesale from Bible’s briefs with supporting material that actually undermines its *675 case. There is nothing in the record that demonstrates that the concept existed pri- or to Bible’s attorneys filing this class action. (As I explained above, the Department’s brief in Barnes did not advocate the position it now holds.)
In an effort to provide some record that the Department developed this interpretation before Bible’s lawsuit, the Department provided two letters: a 1994 general letter to the directors of guaranty agencies and a 1997 letter to the vice president of Texas Guaranteed Student Loan Corporation. Although the excerpts are long, I include them to show how unreasonable and inconsistent the Department’s interpretation is. From the 1994 general letter addressed to the guaranty agency directors:
[W]e have concluded that the amount of the collection costs currently assessed borrowers as reasonable under 34 CFR 682.410(b)(2) is not reasonable when the borrower has shown the initiative to address the default through one of these two programs [loan rehabilitation and loan consolidation]. Therefore, the Department has decided to modify its earlier policy guidance to restrict the amount of collection costs that will be considered “reasonable” under these circumstances to be an amount that does not exceed 18.5 percent of the outstanding amount of principal and accrued interest on the loan at the time the agency arranges the lender purchase to rehabilitate the loan or certifies the payoff amount to the consolidating lender. This percentage is consistent with the percentage a guaranty agency is allowed to retain under the loan rehabilitation program at the time of lender purchase.
Gov’t Amicus Br. 3a (emphasis added). This letter contains no mention of an exception for borrowers who promptly agree to rehabilitation, and it explicitly states that collection costs on rehabilitated loans that do not exceed 18.5% of the outstanding balance and accrued interest are “reasonable.”
Now, from the 1997 letter, which the Department sent to the loan corporation’s vice president in response to his question concerning collection costs for loan repayment agreements under § 682.410(b)(5)(ii)(D):
The Department agrees with your interpretation of 34 CFR 682.410(b)(5)(ii)(D) and its interaction with § 682.410(b)(2)(i). This provision of the regulations provides the borrower an opportunity to enter into a satisfactory repayment agreement before the agency either reports the default to a credit bureau or assesses collections costs against the borrower as required in § 682.410(b)(2). You also are correct that “terms satisfactory to the agency ...” does not require that the loan be paid in full and provides the agency with discretion in establishing a satisfactory repayment agreement with the borrower. If the agency obtains a signed repayment agreement from the borrower within the 60-day period, and the borrower begins to make payments, the agency is not required to assess the borrower collection costs. Collection costs related to the default would be assessed only if the borrower failed to continue to make payments by the repayment agreement.
Gov’t Amicus Br. la (emphasis added). This letter does not concern loan rehabilitation at all. Instead, it confirms that while § 682.410(b)(2) requires the guarantor to charge collection costs, the provision requiring a “repayment agreement on terms satisfactory to the agency” grants the guarantor the discretion to not charge costs. That is a far cry from providing an exception for borrowers who promptly enter into a rehabilitation agreement and *676 comply with that agreement. In fact, the proper inference from the Department’s letter is that, since § 682.405 does not grant the guarantor the same discretion as § 682.410(b)(5)(ii)(D) does, the guarantor must charge collection costs on rehabilitated loans.
To accept the Department’s extraordinary position requires us to hold that a single letter to an assistant vice president of one guaranty agency explaining that the agency has the discretion not to charge collection costs under a repayment agreement constitutes sufficient notice for the rule that all agencies are prohibited from charging costs on rehabilitated loans. That is hardly the kind of “fair warning” required of the Department, especially since Bible seeks to “invoke the [Department’s] interpretation of ambiguous regulations to impose potentially massive liability on [USA Funds] for conduct that occurred well before that interpretation was announced.” Christopher v. SmithKline Beecham Corp., — U.S. -, 132 S.Ct. 2156, 2167, 183 L.Ed.2d 153 (2012) (quotation marks omitted).
The Department’s recent. July 10, 2015, letter purporting to “restate and clarify the rules” (provided to the court by the Department as a “citation of additional authority”) is nothing short of an admission that the Department’s rule is entirely new. Ultimately, the Department is not interpreting the regulations. Instead,
What [the Department] claims for itself here is not the power to make political judgments in implementing Congress’ policies, nor even the power to make tradeoffs between competing policy goals set by Congress. It is the power to decide — without any particular fidelity to the text — which policy goals [the Department] wishes to pursue.
Michigan v. E.P.A., — U.S. -, 135 S.Ct. 2699, 2713, 192 L.Ed.2d 674 (2015) (Thomas, J., concurring) (citation omitted). This raises serious constitutional ques-1 tions.
The Department’s interpretation is not entitled to deference. Furthermore, even if the Department truly interpreted the statutes and regulations prior to the events of this case as it claims, we cannot apply the interpretation to USA Funds. To subject USA Funds — indeed, an entire industry- — to RICO liability based on a rule that was never enforced — and only recently announced — is manifestly unjust.
For all of these reasons, I respectfully dissent.

. I am referring to the options GRC provided to rectify Bible's default. GRC also offered Bible opportunities to review the records pertaining to her loans and to request an administrative review of the legal enforceability or past-due status of her loans. She did not take advantage of these opportunities, and they are not the subject of this litigation.

. The Department cited § 1078-6 with a "see” introductory signal, which is used when "there is an inferential step between the authority cited and the proposition it supports.” The Blue Boor A Uniform System of Citation 58 (Columbia Law Review Ass’n et al. eds., 20th ed.2015). The citation's inferential step is that repayment agreements are like rehabil *670 itation agreements in that they are not bound by the original repayment schedule. Whereas, Bible would have the inferential step be that rehabilitation agreements are like repayment agreements in that the borrower can avoid collection costs. For that to be the case, the citation would have had to support the sentence before the one it did.

. In its brief before the district court in Barnes, the Department made clear that guarantors must charge collection costs or those costs will be borne by the taxpayer:
To restate the problem which the regulation addresses: the student loan guarantor must recover enough to meet its collection costs, or those costs will be charged to the taxpayer — exactly what § 484A [20 U.S.C. 1091a(b) ] was intended to prevent.
Appellant’s App. 66. The Department also disagreed that collection costs assessed by the flat-rate formula could be unreasonable if the costs are in excess of actual costs. Its argument concerned the costs incurred by a guarantor who uses a collection contractor, such as USA Funds used GRC:
A debtor may object that a contractor incurred only modest costs in generating a particular payment, and that the contingent fee earned by the contractor for payment exceeds the "actual costs” of collecting that amount. Such an objection misses the point: the creditor incurs a negotiated contingent fee owed to the contractor for that payment, regardless of the effort needed by the contractor to secure that particular payment. The creditor must pay the contractor, and that cost is a real expense for the guarantor, and one incurred solely because *671 the debtor previously has failed to pay the debt. Because the guarantor incurs that fee, the guarantor can, and must, pass that real cost on to the debtor. Debtors whose loans have been referred by guarantors to contingent fee contractors for collection action have no basis for objecting to liability for a contingent fee charged as a “flat rate" percentage of the payment recovered.
Appellant’s App. 60 (emphasis added).

. Bible’s MPN included an acceleration clause that made the entire unpaid balance of Bible’s loan immediately due and payable in the event of default. Appellant’s App. 122. It also states that "the guarantor may purchase [her] loans and capitalize all then-outstanding interest into a new principal balance, and collection fees will become immediately due and payable.” Id.